GILMAN ET AL. v. ILLINOIS AND MISSISSIPPI TELEGRAPH COMPANY.

COYKENDALL, GARNISHEE, v. IDEM.

1. Where a trial by the court below was not had under the act of March 3, 1865 (13 Stat. 501), the rulings excepted to in the progress of such trial cannot be reviewed here.
2. Where it is clearly implied by the terms of a mortgage executed by a railroad company that the latter was to hold possession and receive the earnings of the road until the mortgagees should take it or the proper judicial authority intervene, such possession gives the right to the whole fund derived therefrom, and renders it, therefore, liable to the creditors of the company as if no mortgage existed.
3. A decree, silent as to the profits and possession of the mortgaged premises from its date until the sale thereby ordered, does not affect the right to such profits and possession during that period.

THESE cases come here from the Circuit Court of the United States for the District of Iowa, — the former by appeal, and the latter by writ of error.

In 1857, the Des Moines Valley Railroad Company, by its then corporate name, in order to secure the payment of its bonds, executed to certain trustees a mortgage of its road, property, and franchises, "together with the tolls, rents, and profits to be had, gained, or levied therefrom."

One of the provisions of this mortgage was as follows : —

" It is hereby further provided, that until failure to pay the interest on said bonds, or to pay the principal at maturity, or to apply, appropriate, set apart, and deposit the several sums of money to be applied, appropriated, set apart, and deposited, as hereinafter provided, the said party of the first part shall have the sole right to the possession, use, management, and control of the said mortgaged property and premises, and of the receipts and revenues thereof, as if this instrument had not been made; but if the said party of the first part shall fail to pay or cause to be paid the principal of the said bonds, or any of them, at the maturity thereof, or shall fail to pay or cause to be paid the interest on the said bonds, or any of them, or any part thereof, on any day whereon the same is made payable by the terms of the said bond, and the same shall remain unpaid for the space of six months after having been demanded, whereby at the option of the holders of one-third in amount of all the outstanding unconverted and unredeemed bonds the principal sum secured thereby shall become immediately payable, or shall fail to apply, appropriate, set apart, and deposit the several moneys required to be applied, appropriated, set apart, and deposited, as hereinafter provided, then and in that case it shall be lawful for the said parties of the second part, their survivor or successor or successors, and it shall be their duty, to enter upon and take possession of all and singular the property, premises, and franchises hereby granted and conveyed, or so expressed or intended to be, and by themselves, or their agent or agents, substitute or substitutes, duly constituted, have, use, operate, and employ the same, making from time to time all needful repairs, alterations, or additions, collect and receive all the tolls, rents, or profits to be had or gained therefrom, and apply all the moneys arising therefrom to the payment of the interest due and to grow due on all the said bonds which may be outstanding, unconverted, and unredeemed, and to the payment of the principal of all and each and every of such bonds when such principal shall become due and payable."

In 1868 the company executed a second mortgage to certain other trustees, in which was conveyed the road with its appurtenances, and " also all rents, issues, income, tolls, profits, currency, moneys, rights, benefits, and advantages derived or to be derived, had or received therefrom by said company in any way whatever."

"To have and to hold the above granted and bargained premises, with the appurtenances thereof, unto the said trustees, and to the survivors and survivor of them, and to their and his successors and successor, and their and his assigns, in trust, and upon the trust, uses, and purposes hereinafter expressed, of and concerning the same, for the use and benefit of the person or persons, firm or firms, bodies politic or corporate, who shall hereafter at any time become the purchasers or holders, owners or bearers, of any or either of said bonds, subject to the terms, provisions, and stipulations in said bonds contained, and also subject to the possession and management of said railroad and property by said company, and its successors and assigns, so long as no default shall be made in the payment of either interest or principal of said bonds, or in any or either of them, or in payment of the amount of money, as is herein provided for the sinking fund, and so long as the said company shall well and truly observe, keep, and perform all and singular the covenants, agreements, conditions, and stipulations in said bond and in this indenture contained and set forth, and which are to be observed, kept, and performed by and on the part of said company.

"And it is agreed, in case of the default of the payment of the semi-annual interest as above provided, that said trustees and the survivor or successors of them are hereby expressly authorized and empowered, upon the request in writing of a majority in interest of the owners or holders of said bonds, to enter into and upon, and to take actual possession of, all the property, real and personal, rights, franchises, and privileges, of the premises hereby conveyed, and each and every part thereof, and by themselves, or by their attorneys or agents, have, hold, use, and enjoy the same, and from time to time make all repairs and replacements, and all useful alterations, additions, and improvements thereto, as fully as the parties of the first part might have done before such entry, and to collect and receive all tolls, freight, incomes, rents, issues, and profits of the same, and of every part thereof."

The trustees never took possession; but, default having been made in the payment of interest on both mortgages, the trustees in the second mortgage, in July, 1872, commenced suit to foreclose in one of the State courts, making the railway company the trustees in the first mortgage, and various judgment and lien creditors of the company parties defendant, and, among others, the Illinois and Mississippi Telegraph Company.    No

receiver was applied for or appointed pending the foreclosure proceedings, except as hereinafter stated.

On May 31, 1873, a decree of foreclosure was entered by the State court, fixing the priorities of the several parties, and holding that the telegraph company's judgment, hereinafter mentioned, was a lien subject to the mortgage in suit and to other specified liens.

The decree ordered a sale of the mortgaged property by the sheriff on special execution, but, as originally entered, made no provision as to the possession or earnings of the road (which was still in the possession of the railroad company, and operated by it) between the date of the decree and the sale which the decree ordered.

On the thirteenth day of June, 1873, the telegraph company issued execution on a judgment for $23,734.10, which it had on the 24th of May, 1872, obtained against the railroad company in the Circuit Court of the United States for the District of Iowa, and garnished, under the statute of the State, moneys in the hands of the agents of the railroad company at its various stations, received by them from the income and earnings of the road.

The trustees in the first and second mortgages filed, June 20, 1873, the present bill in equity against the telegraph company to enjoin the said proceedings upon the execution under its judgment. The bill was, the twenty-seventh day of June, 1873, amended so as to make the Des Moines Valley Railroad Company a defendant; and a temporary injunction, as prayed for, was allowed.

On Sept. 9, 1873, after a sale had been advertised by the sheriff, application was informally made to the State court, by the trustees under the first mortgage, for a modification of the decree of May 31, 1873; and the same was modified by appointing a "special receiver of all the income and earnings of the road" between the date of the decree or sheriff's first publication of notice of sale and the sale to be made by him. This was done, saving the rights of the telegraph company.

The special receiver took possession Sept. 15, 1873. The sale by the sheriff under which the purchasers were let into possession took place Oct. 17, 1873, and left a large amount of the mortgage bonds unpaid.

Between the date of the decree of May 31, 1873, and Sept. 15, 1873, when the special receiver took possession, the road was operated by the railroad company; and, during this period, the net earnings were $27,147.96.

Coykendall, who was garnished, had received $27,000; and judgment in the suit at law was rendered against him for that amount.

The Circuit Court dismissed the bill of the complainants.

*Mr. George G. Wright* for the appellants and the plaintiff in error.

The railroad company had legal capacity to mortgage, and did mortgage, its future earnings; and they became as much part of the bondholders' security as did the road-bed, rolling-stock, or any other part of the mortgaged property. Act of March 31, 1858; Rev. Stat. of Iowa, 1860, p. 222; *Pennock* v. *Coe*, 23 How. 117; *Jessup et al.* v. *Bridge et al.*, 11 Iowa, 573; *Dunham* v. *Isett*, 15 id. 284; 2 Redf. on Railws. 455, 485; *Galveston Railroad* v. *Cowdry*, 11 Wall. 453.

It may be urged by counsel for defendant, that the lien of the mortgages became merged in and extinguished by the decree. The foreclosure proceeding is not for the purpose of obtaining a better or higher order of *lien*, but simply for the purpose of *enforcing* an already existing and sufficient one. The lien of a mortgage is *not* extinguished by decree of foreclosure. *Riley's Adm'r* v. *McCord's Adm'r*, 21 Mo. 287; *State of Iowa* v. *Lake*, 17 Iowa, 215.

If it be true generally, that a mortgage lien is merged in a foreclosure decree, it will, in exceptional cases, be kept alive for reasons similar to those that operate to prevent merger in other similar cases. It is familiar law, that although ordinarily, when the mortgage interest and the equity of redemption unite in the same person, the former will become merged in the latter, yet, when the interest of the common owner requires that they shall remain distinct and separate, such will be presumed to have been his intention, and the lien of the mortgage will be kept alive for the purpose and to the extent of upholding such interest.

The same rule, for the same reason, should be held to apply in favor of the bondholders in the case at bar to the extent of

keeping alive the mortgage lien as to the item of earnings to whatever extent their interest requires.

If by foreclosure the mortgage lien becomes merged, it can only be so to the extent that the mortgaged property is, by the proceedings and the terms of the decree, sought to be subjected to the payment of the mortgage indebtedness. The bondholders may enjoin a judgment creditor of the road, who, by garnishment, seeks to subject its income and tolls to the payment of his debt. *Dunham* v. *Isett*, 15 Iowa, 284; *Long* v. *Matheison*, 2 Giff. 71; *Furness* v. *Chaterham Railway*, 29 Beav. 358; *State* v. *North Central R.R. Co.*, 18 Md. 193.

*Mr. J. Scott Richman* and *Mr. J. D. Caton, contra.*

The general laws of Iowa provide, that, in the absence of stipulations to the contrary, the mortgagor of real property retains the legal title thereto, and the right to the possession thereof. His estate is the subject of a lien, of a sale under execution, or of his conveyance. *Curtis* v. *Millard et al.*, 14 Iowa, 128.

This estate is not covered by any general mortgage. It can only be parted with by special contract, — by " *stipulations to the contrary.*" If they provide, that, under certain circumstances, this right shall be surrendered in a particular form or way, that form must be followed. Until the claim is made therefor, the possession and the rents and profits of the road belong rightfully and legally to the mortgagor, subject to execution, lien, or sale. *Curtis* v. *Millard et al., supra.*

The decree is now the evidence of the lien of the bondholders upon the railroad. If their lien is not thereby fixed upon the earnings of the road between the date of the decree and the time when the purchaser thereunder would be entitled to the possession of the road, then there is no such lien; and the court below could not give the complainants the relief which the State court withheld, in adjudicating their rights under their mortgage. The debt is the principal thing. The mortgage is a security merely. Whatever satisfies the debt merges the security. If the debt is barred by the statute of limitations, the mortgage is barred also. *Newman* v. *De Lorimer*, 19 Iowa, 214. The appellants, having a lien by virtue of their mortgage, instituted a proceeding to have it enforced.

Having failed to take or demand possession of the railroad, or to pray for the appointment of a receiver, they obtained such relief as they were entitled to upon the case made by the pleadings and proofs. Their mortgage having been merged, it cannot defeat the rights of the telegraph company, which attached by the levy of its execution. *Goodrich et al.* v. *Dunbar*, 17 Barb. 644; Freem. on Judg., sect. 125; *Green* v. *Sarmiento*, 1 Pet. C. C. 74; *Butler* v. *Miller*, 1 Den. 407; *Carson* v. *Montino*, 2 Johns. 308; *United States* v. *Price*, 9 How. 83–94; *Willings & Francis* v. *Consequa*, 1 Pet. C. C. 393; *Ward* v. *Johnson*, 31 Mass. 140; *Robertson* v. *Smith*, 18 Johns. 459; *Eldred* v. *Bank*, 17 Wall. 545; *Mason* v. *Eldred*, 6 id. 231; *Jones* v. *Johnson*, 3 W. & S. 276; *The People* v. *Beebe*, 1 Barb. 388; *Ayres* v. *Cayce*, 10 Tex. 99.

It is well settled in Iowa, that a party cannot have greater relief than he asks for in his petition, or than the averments of his petition entitle him to. Code, sect. 2885; *Cameron* v. *Boyle*, 2 Gr. 164; *Haven* v. *Birch*, 5 Iowa, 503; *Stadler* v. *Parmelee*, 10 id. 23. If, as in this case, the right to the earnings depends upon a contract, or a stipulation which provides the mode in which they shall be received and applied, that mode must be pursued, or there must be some attempt to pursue it by a demand made of whatever may be necessary to secure them. If such demand is refused, then the law points out the remedy; but there must be a foundation laid for the appointment of a receiver by averment and proof of the necessary facts. *Insurance Co.* v. *Stebbins*, 8 Page, 565; *Aston* v. *Turner*, 11 id. 436; *Mitchell* v. *Butler*, 51 N. Y. 447; *Classen* v. *Cooley*, 5 Sandf. 447; *Strong* v. *Dallner & Potter*, 2 id. 444. The cases of *Galveston Railroad* v. *Cowdry*, 11 Wall. 459–482, *Noyes* v. *Rich*, 52 Me. 115, and *City of Bath* v. *Miller*, 51 id. 341, are precisely in point.

As to the judgment against the garnishee, it is submitted that only such rulings of the court below as are excepted to at the time, and duly presented by bills of exceptions, can be reviewed here. *Dickinson* v. *The Planters' Bank*, 16 Wall. 250.

This would be the law, if this case had been tried under the act of March 3, 1865; but it was not. A case at law, in which

there were questions both of law and fact to decide, was sub-
mitted to the court. The judgment below must, therefore, be
presumed to be right; and it will be affirmed.    *Campbell et al.*
v. *Clement Boyean*, 21 How. 223; *Gould et al.* v. *Frontin*, 18 id.
135; *Saydam* v. *Williams et al.*, 20 id. 432; *Kelsey et al.* v.
*Forsyth*, 21 id. 85; *Kearny* v. *Case*, 12 Wall. 273, 284; *Phil-
lips* v. *Preston*, 5 How. 290.

*Mr. William M. Evarts* in reply.

In advance of the direct consideration of the equities of the
plaintiffs, under their mortgage and subsequent to their fore-
closure decree, as against this judgment creditor, under his
execution it is well to define and understand these equities as
between the plaintiffs and the railroad company (the mortgagor
to the plaintiffs and the judgment debtor).

There seems but little controversy on this preliminary rela-
tion. The growing income and earnings were, by words most
comprehensive and explicit, made a part of the subject mort-
gaged; and the right of the mortgagee, upon the mere condition
of default in payment of interest, to subject the income and
earnings to the satisfaction of the mortgage debt, was as clear
as such right in respect to the body of the real and personal
estate of the company. This was a clear and absolute right by
the contract of the mortgage; and the only function of a court
of equity, if the mortgagor resisted the execution of this right
by the mortgagee taking possession, was to *execute* the right by
its process, accomplishing the specific performance of the con-
tract in this behalf. This clear *right* under such a railroad
mortgage must not be confounded with an *equity* raised by a
chancery court out of special circumstances, and grafted upon
a mere mortgage of the fee. Thus, in case of a mortgage of
productive property conveying the fee, upon the concurring
circumstances of insolvency of the mortgage debtor, and the
insufficiency of the fee to satisfy the principal debt and the ac-
cumulating interest and costs, the Court of Chancery finds a
ground for a *special equity* to lay hold of the rents in aid of the
failing security of the fee. This equity springs into existence
from these extraneous facts, and *dates from the judgment of the
court thereon.* Necessarily, therefore, all competing liens ante-
dating this judgment of the court, legal or equitable, must be

respected and maintained in their priority; but when the *right* of the mortgagee springs from his contract, and dates from the default of the mortgagor for its actionable completeness, no competing lien which does not antedate the mortgagor's default in its asserted priority will be respected and upheld by a court of equity. If the competing lien be asserted by process of a common-law court, the Court of Chancery appealed to for relief rescues the property from its sequestration, because the perfect equitable lien of the contract of the mortgage has rested on the property from the date of default in the debtor, and so the legal process has been anticipated by the equitable lien.

This proposition cannot be disputed. *Gal. & Ch. Un. R.R. Co.* v. *Menzies*, 26 Ill. 121.

It cannot be doubted, that if the debtor recognized this equitable lien, and administered the income and earnings of the road in obedience to it, paying thereout the running expenses, and applying the surplus to the mortgage debt, the mortgagee has no occasion to disturb the possession of the mortgagor by the interposition of a receivership. No doubt the mortgagee may, by want of vigilance, suffer the income and earnings to slip away irrecoverably from his equitable lien, and, by intervening through the powers of a court of equity, can only secure the proper application of the future income or earnings. Whether this will happen or not will depend wholly on the state of things when he intervenes. If he is in season to intercept the income and earnings before they have been collected or *expended*, as between himself and the debtor, he is in time. If the interference comes from a *creditor* of the mortgagor, the like rule applies. If the mortgagee intervenes in time to arrest, by equitable process, the diversion of the income and earnings from under his equitable lien, in point of fact his intervention is seasonable in point of law.

The stress of the argument against the plaintiffs' equity, and in support of the prevalence of the execution at law over it, rests upon the singular suggestion, that the *judgment of foreclosure* has limited and superseded the plaintiffs' equitable lien, and given license to the operation of the judgment creditor's execution, which, but for this consequence of the actual judg-

ment of foreclosure, it would not have had.   The reasoning upon which this proposition rests is wholly technical and artificial.   It confessedly is without equity, and attempts an advantage from the course of the foreclosure suit which was uncontemplated and unnecessary, and is as surprising as it is unjust.

In the case at bar, the lien of the mortgage and its continuance up to the *sale* of the mortgaged premises is the very life and support of the decree up to its final execution by such sale. As to this judgment creditor, the lien of its *judgment* upon the mortgaged premises, and every part thereof, had been adjudicated in this decree, its subordination to the plaintiffs' lien established, and the possibility of interference with, or disparagement of, the plaintiffs' lien by or through that *judgment*, precluded.

But, subsequent to the decree in foreclosure, process on this *judgment* against income of the mortgaged premises, to accrue between the decree and its execution, issues, on the ground that the income, during this interval, *is not covered by the decree, and the subordination of the judgment to the mortgage in this behalf has not been adjudicated;* in other words, that the execution raises a *new lien* upon a *new subject.*

It is submitted that the decree in foreclosure is no bar to a suit to restrain an inequitable interference with the income of the road, first threatened after the decree, and in respect of income arising thereafter.   The injunction suit is ancillary to the objects of the principal suit, and to suppress an inequitable subtraction of a portion of the mortgaged property from the equitable lien of the mortgagee.

If any circumstance were wanting to exhibit the falsity of reasoning and the injustice in result by supporting this garnishee process, it is supplied by the evidence in the principal cause, that the fund sought to be applied in satisfaction of the judgment comes from earnings, for the most part, accruing *after* this injunction bill was filed by the plaintiffs.   In effect, an *equitable* execution is given by the Circuit Court to the judgment creditor to sequestrate income confessedly covered by the prior express lien of the plaintiffs' mortgage, *after* suit begun to enforce the lien of the latter.

MR. JUSTICE SWAYNE delivered the opinion of the court.

These cases have been argued together, and will be decided together.   The case at law will be first considered.

On the 24th of May, 1872, the telegraph company recovered in the Circuit Court of the United States for the District of Iowa a judgment for the sum of $23,734.04 and costs.   On the 13th of June following, execution was issued.   On the 17th of that month, the marshal to whom the process was directed served it by attaching as garnishees several persons, one of whom was Coykendall, the plaintiff in error.   On the 27th of October, 1873, he filed his answer; and on the 27th of October, 1874, he filed a further answer.

By the first answer he admitted, that, since he was garnished, he had received for and paid over to the railroad company more than $37,000.   In his second answer he set forth that he was the agent of the railroad company at Des Moines; and that his duties were to sell tickets and receive and ship freight, and to receive the charges upon such freight.   For the moneys received both for tickets and freight a large proportion belonged to other companies, but how much he did not know.   All the moneys he received were regularly transmitted to the assistant-treasurer of the Des Moines company.

The proper apportionment of the moneys was made by the officers of that company at Keokuk, and the Des Moines company was accountable to the other companies for what belonged to them.   He was not in the employment of any other company or person during the time mentioned, and was not responsible to any other company or person for the moneys which he received, as before stated.

The gross amount received by him, between the time he was garnished and the appointment of the receiver who took possession of the road, was $27,000.

The case was submitted to the court, and argued by the counsel upon both sides.   The next day it was stated to the court by the counsel for the defendant that proof could be adduced of the proportion of the moneys in question which belonged to other companies, and time was asked to procure it. The application was overruled, and the court gave judgment

for $27,000 and costs. The garnishee thereupon excepted to the ruling of the court refusing further time.

The case having been submitted to the court and argued by the counsel of both parties, the garnishee not asking for a jury, the record in this respect shows no error. It is to be taken that both parties waived a trial by jury, and they are bound accordingly. *Phillips* v. *Preston*, 5 How. 278; *Campbell* v. *Boyreau*, 21 id. 224; *Kelsey* v. *Forsythe*, id. 86. The proceeding not having been according to the act of March 3, 1865, this court has no power to examine any ruling of the court below excepted to during the progress of the trial. *Campbell* v. *Boyreau, supra; Guild et al.* v. *Fontin*, 18 id. 135; *Kearney* v. *Case*, 12 Wall. 275; *Dickinson* v. *The Planters' Bank*, 16 id. 250. The only point attempted to be presented by the bill of exceptions was the refusal of the court to give time for the production of further evidence. If this subject was before us in such a shape that we could consider it, it would be a conclusive answer that the matter was one resting in the discretion of the court. Its determination, therefore, could not be reviewed by this tribunal.

This brings us to the examination of the case in equity.

The bill was filed to prevent, by injunction, the collection of the moneys upon which the judgment in favor of the telegraph companies was founded. There is no controversy between the parties as to the facts.

On the 16th of February, 1857, the railroad company, by its then corporate name, executed a mortgage; and on the 1st of October, 1868, by its corporate name as altered, executed another. Both were given to secure the payment of its bonds as set forth. A part of the premises described and pledged by both mortgages, besides the road, was its income.

In case of default in the payment of interest or principal, the mortgagees were authorized to take possession, and collect and receive the income and earnings of the road, and apply them to the debts secured, and, upon the request of one-third of the bondholders, to sell the mortgaged premises.

The conditions of both mortgages having been broken, the mortgagees in the second mortgage filed their bill of foreclosure in the Circuit Court of Polk County, in the State of Iowa.

The mortgagees in the second mortgage — various judgment and lien creditors, among the former the telegraph company — were made defendants.   On the 31st of May, 1873, a decree of fore-closure and sale was rendered.   It fixed the priorities of the several parties, and held that the judgment of the telegraph company was a lien subject to the mortgage in suit and other specified liens.   It ordered a sale of the mortgaged property.   The road was still in possession of the company.   The decree made no provision for disturbing their possession, and none whatever as to the income of the road between the time of the decree and the time of the sale.   The telegraph company pro-ceeded, as we have stated, in disposing of the case at law.   On the 20th of June, 1873, the appellants, who are the trustees in the two mortgages, filed this bill.   On the 9th of September, 1873, after the sheriff had advertised the mortgaged premises for sale, the decree in the State court was amended by providing for the appointment of "a special receiver of all the income and earnings of the road" between the date of the decree and the time fixed by the sheriff for the sale to be made by him. This was done with a saving of the rights of the telegraph company   The special receiver took possession on the 15th of September, 1873.   The sale by the sheriff was made on the 17th of October, 1873.   The road was operated by the company up to the time when the receiver took posses-sion.

During this period, the fund was received for which judg-ment was given against Coykendall.

The proceedings in the case at law having been held valid, the telegraph company is entitled to the fund in controversy, unless the appellants have shown a better right to it.   The question arises upon the mortgages.   The civil law is the spring-head of the English jurisprudence upon the subject of these securities.   Originally, according to that jurisprudence, mort-gages of the class to which those here in question belong vested the fee, subject to be divested by the discharge of the debt at the day *limited* for its payment.   If default was then made, the premises were finally lost to the debtor.   In the progress of time more liberal views prevailed, and the debt came to be con-sidered as the principal thing, and the mortgage only as an

incident and security.    In the present state of the law, where there is no prohibition by statute, it is competent for the mortgagee to pursue three remedies at the same time.    He may sue on the note or obligation, he may bring an action of ejectment, and he may file a bill for foreclosure and sale.    1 Hill. on Mort. 9, 62; id. 104, 111; *Andrews* v. *Sutton,* 2 Bland, 665.

The remedy last mentioned was resorted to in the State court by the mortgagees in the second mortgage, those in the first having been made parties, and that mortgage thus brought before the court.    That court, therefore, had full jurisdiction as to the rights of all the parties touching both instruments.    It would have been competent for the court *in limine,* upon a proper showing, to appoint a receiver, and clothe him with the duty of taking charge of the road and receiving its earnings, with such limit of time as it might see fit to prescribe.    It might have done the same thing subsequently, during the progress of the suit.    When the final decree was made, a receiver might have been appointed, and required to receive all the income and earnings until the sale was made and confirmed, and possession delivered over to the vendee.

Nothing of this kind was done.    There was simply a decree of sale.    The decree was wholly silent as to the possession and earnings in the mean time.    It follows that neither, during that period, was in any wise affected by the action of the court.

They were as if the decree were not.

As regards the point under consideration, the decree may, therefore, be laid out of view.

The stipulation renders it unnecessary to consider the amendment to the decree.

Without that stipulation, the result would have been the same.    It could not affect rights which had attached before it was made.

Nothing was done in the exercise of the right which the mortgages gave to the mortgagees to intervene and take possession.    We may, therefore, lay out of view also both these topics.

This leaves nothing to be examined but the effect of the mortgages, irrespective of any other consideration.

A mortgagor of real estate is not liable for rent while in

possession.   2 Kent's Com. 172.   He contracts to pay interest, and not rent.   In *Chinnery* v. *Black*, 3 Doug. 391, the mortgagor of a ship sued for freight earned after the mortgage was given, but unpaid.   Lord Mansfield said, "Until the mortgagee takes possession, the mortgagor is owner to all the world, and is entitled to all the profit made."   It is clearly implied in these mortgages that the railroad company should hold possession and receive the earnings until the mortgagees should take possession, or the proper judicial authority should interpose. Possession draws after it the right to receive and apply the income.   Without this the road could not be operated, and no profit could be made.   Mere possession would have been useless to all concerned.   The right to apply enough of the income to operate the road will not be questioned.   The amount to be so applied was within the discretion of the company.   The same discretion extended to the surplus.   It was for the company to decide what should be done with it.   In this condition of things, the whole fund belonged to the company, and was subject to its control.   It was, therefore, liable to the creditors of the company as if the mortgages did not exist.   They in no wise affected it.   If the mortgagees were not satisfied, they had the remedy in their own hands, and could at any moment invoke the aid of the law, or interpose themselves without it. They did neither.

In *Galveston Railroad* v. *Cowdrey*, 11 Wall. 459, substantially the same question arose as that we are considering.   The mortgage there contained provisions touching the income of the road similar to those in the mortgages before us.

This court held, that, at least until after a regular demand was made, those who received the earnings were not bound to account for them.   See also *The City of Bath* v. *Miller*, 51 Me. 341; *Noyes, Receiver*, v. *Rich*, 52 id. 115.

Upon both reason and authority, we think the appellants have no right to the fund in controversy.

*Decree affirmed.   Judgment affirmed.*